**ADELPHIA COMMUNICATIONS CORP., Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents.**

**No. 95–1026.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 18, 1995.

Decided July 23, 1996.

Terry S. Bienstock, Miami, FL, argued the cause for petitioner with whom Ira I. Hershkowitz, Miami, FL, Seth A. Davidson, Washington, DC, and Randall D. Fisher, Coudersport, PA, were on the briefs. Richard B. Beckner entered an appearance.

Clifford G. Pash, Jr., Counsel, Washington, DC, Federal Communications Commission, argued the cause for respondents, with whom William E. Kennard, General Counsel, Daniel M. Armstrong, Associate General Counsel, Anne K. Bingaman, Assistant Attorney General, United States Department of Justice, Catherine G. O'Sullivan and Nancy C. Garrison, Attorneys, were on the brief. John E. Ingle, Deputy Associate General Counsel, and Laurence N. Bourne entered appearances.

Before: EDWARDS, Chief Judge, SILBERMAN and GINSBURG, Circuit Judges.

Opinion for the court by GINSBURG, Circuit Judge.

GINSBURG, Circuit Judge:

Adelphia Communications petitions for review of a Federal Communications Commission regulation governing the rates that a cable system operator may charge for a discounted package of premium programming, *i.e.*, a package of channels and programs that may also be purchased individually. Having concluded that the Commission acted within its authority under the Cable Act to impose such a regulation, and that the Commission acted reasonably in adopting the regulation, we deny the petition.

## I.  Background

Eight years after enacting the Cable Communications Policy Act of 1984, which resulted in deregulation of the rates that cable television system operators charge their subscribers, the Congress reimposed federal regulation of those rates. In *Time Warner Entertainment Co., L.P. v. FCC*, 56 F.3d 151, 162–63 (D.C.Cir.1995), we described at some length the regulatory regime established by the Cable Television Consumer Protection and Competition Act of 1992. Pub.L. No. 102–385, 106 Stat. 1460. Here we re-state only the details most relevant to the present case.

Except with respect to so-called premium programming (of which more in a moment), a cable system that does not face "effective competition" as that term is defined in the Act—and the "vast majority" of cable systems do not, *Time Warner*, 56 F.3d at 179–80—is subject to rate regulation under the Act. 47 U.S.C. § 543(a)(2); *see also* 47 U.S.C. § 543(*l*)(1) (defining "effective competition"); 47 C.F.R. § 76.906 (lack of effective competition presumed). Thus, the Act (1) requires that most cable systems offer a "basic service tier" subject to rate regulation by a state or local franchising authority pursuant to rules established by the FCC, 47 U.S.C. § 543(a)(2)-(6) and (b)(1); *see also* 47 U.S.C. § 543(b)(7) (defining "basic service tier"), and (2) subjects to regulation by the FCC itself the rates these systems charge for so-called "cable programming service," *i.e.*, a tier of video programming that is neither part of the basic service tier nor offered on a per channel or per program basis. § 543(a)(2)(B) & (c); *see also* § 543(*l*)(2) (defining "cable programming service"). Finally, the Act (3) exempts from rate regulation all premium programming, which it refers to as video programming that is offered on a per channel or per program basis (such as the Home Box Office channels and championship boxing matches), regardless whether the cable operator is subject to "effective competition." § 543(a)(1)-(2), (*l*)(2).

The Act does not say whether the rate that a cable system operator charges for a package of premium channels or programs that are also offered separately—oxymoronically called an "a la carte package" in FCC jargon—is subject to regulation. Noting that this question had generated "sharply conflicting comments" from cable operators and programmers on one side and from municipali-

ties and subscriber advocates on the other, the Commission initially concluded that the rate charged for an a la carte package ought not be regulated "so long as two essential conditions are met." *Implementation of Sections of the Cable Television Consumer Protections and Competition Act of 1992: Rate Regulation* (hereinafter *"Rate Regulation"*), MM Dkt. No. 92–266, 8 FCC Rcd 5631 ¶¶ 325, 327 (April 1993). First, the cable operator had to continue to offer the component parts of the package individually, *id.* at ¶ 328; and second, the price of the premium package could not exceed "the sum of the individual charges for each component service," *id.* at ¶ 327. (Query, why would anyone pay more for the package than for the parts?) The Commission believed that with these "safeguards" market forces were "likely to ensure that rates [for a la carte packages remained] reasonable"; regulation of such rates, therefore, "would not serve the purposes of the Cable Act" which "contains a clear and explicit preference for competitive resolution of issues where that is feasible". *Id.* at ¶ 329 & 2. Indeed, "regulation in such circumstances might be counterproductive" because it might discourage operators from offering a discount (*i.e.,* from piece prices) on a package of premium services. *Id.* at ¶ 329.

At the same time, the Commission recognized that exempting premium packages from rate regulation might invite operators to engage in evasive maneuvers inconsistent with the policies of the Act. The FCC made clear, therefore, that the first condition for regulatory exemption—that the operator continue to offer the components of the package individually—"is satisfied only when the per channel offering provides consumers with a realistic service choice." *Id.* ¶ 328 n. 808. In this regard the Commission referred to its statutory obligation not only to address evasive practices case by case but also periodically to "review and revise [its] regulations on evasion." *Id.* ¶ 451.

Concern about evasive behavior and the difficulty involved in detecting it also prompted the Commission to comment upon the possibility that the exemption of premium packages from rate regulation would invite cable operators opportunistically to restructure their offerings. The Commission stated its belief that the Cable Act does not "require [it] to restrict the movement of a channel [from a regulated service tier] to premium and deregulated status," *id.* ¶ 441 n. 1105, and decided not to restrict such channel shifting because it had "no evidence that operators would or, as a business matter, could shift programming previously offered as part of a tier to 'a la carte' status ... to avoid the rate regulation applicable to tiers." *Id.* at ¶ 453 n. 1161. At the same time, the Commission reserved the question "whether a shift of programming from a tier to an 'a la carte' offering in and of itself would constitute evasion." *Id.*

Five months later, but still a few days before the regulations took effect, the FCC defended its so-called "tier-neutral" approach to rate regulation—meaning that it applies the same "benchmark formula and rollback requirements," *see Time Warner,* 56 F.3d at 180, to the basic and cable programming service tiers—against various complaints including the claim that tier-neutral regulation creates an incentive to shift programming from regulated to unregulated status by offering it a la carte in order to avoid regulation. *Rate Regulation,* MM Dkt. No. 92–266, 9 FCC Rcd 1164 ¶¶ 31–35 (First Order on Reconsideration, August 1993). The Commission explained that by calling for regulation to hold the rates for all tiers of service down to "reasonable" competitive levels, it was the Cable Act itself, not the FCC's tier-neutral approach, that created the incentive for operators to avoid regulation. *Id.* at ¶ 35. The Commission also stated its view that "restructuring program offerings to provide more *a la carte* services is not *per se* undesirable" because it serves the statutory goal of increasing consumer choice, and reiterated its doubt that "operators, as a business matter, have unlimited ability to shift programming from tiers to per-channel offerings." *Id.*

Roughly seven months after the regulations took effect the Commission noticed that "a number of operators ha[d] restructured service offerings so that channels that could have been subject to regulation [had] been removed from a regulated tier and [were]

being offered on an 'a la carte' basis as well as on package basis." *Rate Regulation,* MM Dkt. No. 92–266, 9 FCC Rcd 4119 ¶ 193 (Second Order on Reconsideration, March 1994). Because operators could "raise their overall rates for the same service by removing channels from regulated tiers and offering them on a package and on an 'a la carte' basis," *id.* at ¶ 193, and because the Commission had received comments suggesting "that some of these offerings may not comply with [the] requirement that subscribers must have a realistic option to purchase [a la carte] channels that are not subject to regulation," *id.,* the Commission re-examined its position.

The FCC then re-affirmed its belief that it could better serve the public interest by leaving unregulated the rate for any premium package the price of which did not exceed the sum of the charges for the component services offered separately. *Id.* at ¶ 194. The Commission reiterated its concern, however, that the a la carte offering be a "realistic service choice," *id.* at 194, and issued "interpretive guidelines" to help cable operators and regulators determine whether in a particular case an offering of a la carte programming—packaged and separate—would be considered an evasion of rate regulation rather than a realistic service alternative. *Id.* at ¶ 195. These guidelines included five factors that would count in favor of exemption and ten that would count in favor of regulation. *Id.* at ¶ 196.

The Commission issued the guidelines in March 1994, but by November experience with "cable operators [that had] evaded rate regulation by purporting to offer channels a la carte, when in fact the individual offerings were not a realistic service alternative," had persuaded the Commission that the guidelines could not accomplish their purpose. *Rate Regulation,* MM Dkt. No. 92–266 ¶ 45 (Sixth Order on Reconsideration, November 1994):

> [W]e must acknowledge that there is merit to the industry's claim that neither our original two-part test nor our interpretive guidelines provides a clear answer with respect to the permissibility of some a la carte packages that have been offered. Indeed, it is perhaps inevitable that our

test would not be capable of precise application in many instances because it is not clear how various factors should be weighed and applied.

The Commission therefore concluded that a premium package should be regulated as a tier of cable programming service. *Id.* at ¶ 46; *see also* 47 C.F.R. § 76.986(a). In support of this new position the agency drew upon the terms of the Cable Act, its legislative history, and practical considerations. *See id.* at ¶¶ 46–53.

Although the Commission changed its position on premium packages, it did not alter its earlier decision to "grandfather" packages composed entirely of programming continuously available on a per channel or per program basis since the agency's initial order (April 1, 1993). *Id.* at ¶¶ 41 & 51. Henceforth, a cable operator would be free to create packages of premium channels under new rules governing "new product tiers" and to price those new offerings as it saw fit. 47 C.F.R. § 76.987(a). Operators would not be allowed, however, to move a channel from a regulated tier to a new product tier. *Id.* at ¶ 51; 47 C.F.R. § 76.986(c)(1).

The "difficult question" facing the FCC concerned the treatment of a la carte offerings created between April 1993 and the change to the new regulatory regime in September 1994. *Id.* Seeing "little reason to require an operator to 'reverse migrate' a package that was not clearly ineligible for unregulated treatment under [its former] a la carte policy," the Commission decided to treat as a new product tier any premium package first offered under the old regime if (1) the operator had reasonable grounds for believing that the package was exempt, and (2) the package does not contain more than "a small number of migrated channels." *Id.;* 47 C.F.R. § 76.986(c)(2).

Meanwhile, in 1993 Adelphia had restructured the rate and service offerings of most of its cable systems so that every channel previously offered on a bundled basis could be purchased both a la carte and as part of a discounted package. Under the Commission's Sixth Order on Reconsideration, however, such package prices were deemed subject to rate regulation; they were not eligible

for the grandfather clause and did not meet the requirement of the "small-number rule." Adelphia therefore petitioned this court for review of the Sixth Order on Reconsideration insofar as it instituted rate regulation and the small-number rule.

## II. Analysis

Adelphia raises two challenges to the rules promulgated in the Sixth Order on Reconsideration. First, Adelphia argues that the 1992 Cable Act does not authorize the FCC to regulate the rate a cable operator may charge for a discounted package of video programming services each of which the operator offers also on an individual basis. Second, Adelphia argues that even if the Cable Act does authorize such regulation, the Commission's distinction among a la carte packages based upon the number of migrated channels they contain (a) is arbitrary and capricious in that the FCC has justified neither the distinction nor its retroactive application and (b) violates the First Amendment of the United States Constitution.

## A. Authority to Regulate Rates

■ Adelphia argues that the text, the purpose, and the legislative history of the Cable Act plainly deny the Commission authority to regulate the rate a cable system operator may charge for a discounted package of premium programming that it also offers a la carte. Adelphia also asks us not to defer under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), to the Commission's current interpretation of the Act, because the agency has not adequately explained the reason for abandoning its original interpretation. None of Adelphia's arguments has merit.

The FCC may regulate the rate an operator charges for "cable programming service." 47 U.S.C. § 543(a)(2)(B). The question whether the FCC has the authority it claims to regulate a package of premium programming all the elements of which are also offered a la carte turns upon the meaning of the quoted phrase, which is defined in § 543(*l*)(2) as:

any video programming provided over a cable system, *regardless of service tier*, including installation or rental of equipment used for the receipt of such video programming, other than (A) video programming carried on the basic service tier, and (B) video programming offered on a per channel or per program basis.

The emphasized term "service tier" is in turn defined as "a category of cable service or other services provided by a cable operator and for which a separate rate is charged by the cable operator." 47 U.S.C. § 522(16).

By joining the phrases "regardless of service tier" and "other than video programming offered on a per channel or per program basis," Adelphia reads § 543(*l*)(2) as though it excluded from the definition of "cable programming service" (and thus from the reach of rate regulation) not only individual premium services offered a la carte but also a service tier—*i.e.*, a package—of such offerings. Far from finding this proposition so patent as to preclude the contrary interpretation adopted by the Commission, we think Adelphia's construction is strained and implausible; indeed, Adelphia's reading is almost the opposite of what § 543(*l*)(2) actually says.

Still, Adelphia insists that the Commission's interpretation of § 543(*l*)(2) renders superfluous § 543(h), which grants the agency authority "to prevent [regulatory] evasions, including evasions that result from retiering." Adelphia offers no reason to believe, however, what its argument necessarily implies, namely that the Congress created this authority solely because it was concerned that cable operators would shift programming from regulated tiers to unregulated a la carte packages. The House Report pretty clearly suggests otherwise. *See* H.R.Rep. No. 628, 102d Cong., 2d Sess. (1992)("For example, the Committee intends for the FCC to view a change in cable service from one tier offering a broad package of programming for $15/month or two tiers offering the same programming for $5/month (for the basic service tier) plus $15/month (for an expanded basic tier) as a$5/month increase").

Adelphia points to nothing in the legislative history of the Act nor to any purpose of the Act the fulfillment of which requires a non-literal reading of § 543(*l*)(2). Its reference to a House Committee statement concerning multiplexed premium services is way off the mark: "multiplexing" there refers to the practice of offering "multiple channels of commonly-identified video programming as a separate tier (e.g., HBO1, HBO2, and HBO3)," *id.* at 80, not the packaging of unrelated premium services. And while deregulation of the rates charged for premium packages might well call forth an increase in the supply of a la carte offerings—which, considered in isolation, would serve the statutory purpose of promoting competition and consumer choice, *id.* at 90; S.Rep. No. 92, 102d Cong., 1st Sess. 77 (1991)—Adelphia offers no reason to doubt the Commission's judgment that the benefit to consumers of having more a la carte offerings could be more than offset by the increased prices that cable system operators would charge if the rates for premium packages were not regulated.

What we have said above renders *Chevron* deference to the Commission's interpretation of the Act somewhat beside the point; the Commission's reading of § 543(*l*)(2) is not only reasonable, it is far more reasonable than Adelphia's. We pause only briefly, therefore, to comment upon Adelphia's charge that the FCC has forfeited its entitlement to deference because it did not give a reasoned analysis for its "about-face" regarding the application of the Cable Act to premium packages. Not only did the Commission provide a reasoned analysis based upon its experience under the Second Order on Reconsideration, it turned somewhat less than 180 degrees from its original interpretation of the statute.

The Commission has always recognized that § 543(*l*)(2), read literally, requires regulation of the rates charged for premium packages. Because the Commission anticipated that such regulation might serve the purpose of the statute less well than would an unregulated market, however, it initially decided not to apply § 543(*l*)(2) literally. Experience soon dispelled the basis for that decision; the resulting opportunities for regulatory evasion exceeded what the Commission anticipated or could adequately address case by case. As the Commission explained in other words, when the facts changed, the agency changed its position. Even if we do not defer at all to the Commission's authority, therefore, we defer to the force of its reasoning. To do otherwise would be to insist upon "a foolish consistency" indeed.

**B. The Small–Number Rule**

As noted above, Adelphia challenges the small-number rule both as arbitrary and capricious, presumably in violation of the Administrative Procedure Act, and as a violation of its rights under the first amendment. The Commission urges us not to reach the merits of these claims either on the ground that they were not raised before the Commission or because they are not yet ripe for review.

*1. Threshold Issues.* We take up first the Commission's threshold objections.

*(a) Exhaustion of Administrative Remedies.* Adelphia points out that Newhouse Broadcasting, in response to the Second Order on Reconsideration, objected to the small-number rule on the ground that it lacks a "rational basis," and objected to its corollary, retroactive imposition of refund liability, on the ground that it would be "grossly unfair" to make cable system operators liable for refunds with respect to rates charged while the Commission's rules were unclear. *Rate Regulation,* MM Dkt. No. 92–266 (Reply Comments of Newhouse Broadcasting, July 1994). Without even a reference to the Constitution let alone a suggestion that the rule burdens speech, this objection does not raise any recognizable first amendment claim. Rather, the Newhouse filing reads more like an arbitrary and capricious claim arising under the APA (although the statute is not cited either).

Adelphia cites footnote 3 in *Northwestern Indiana Telephone Co., Inc. v. FCC,* 872 F.2d 465, 470 (D.C.Cir.1989), for the proposition that a facial constitutional challenge to an FCC rule is "not generally subject to exhaustion requirements." While the court did not distinguish carefully between the constitutional challenges advanced against the stat-

ute and against the regulation there at issue, *N.I.T.C.* must be read in the light of our earlier decision in *Continental Air Lines v. Dep't of Transportation*, 843 F.2d 1444 (D.C.Cir.1988). There we made it clear that although a constitutional attack upon a statute need not be raised before the agency—citing *Weinberger v. Salfi*, 422 U.S. 749, 765, 95 S.Ct. 2457, 2466–67, 45 L.Ed.2d 522 (1975), as we did in the *N.I.T.C.* footnote—a constitutional attack upon an agency's interpretation of a statute is subject to the exhaustion requirement; the agency must be given "a shot at wrestling with the statute in a way that, in the agency's view, would comport with the demands of the First Amendment." 843 F.2d at 1456. The Commission was not given that shot here, and so we decline to reach the merits of Adelphia's constitutional claim.

*(b) Ripeness.* The Commission argues that Adelphia's APA challenges to the small-number rule are not ripe for review because the agency has not yet applied the rule; therefore the Commission's policy has not been fleshed out sufficiently to allow the court to see its "concrete effects and implications." *American Trucking Ass'ns, Inc. v. ICC*, 747 F.2d 787, 789 (D.C.Cir.1984). We believe, however, that the rule and its apparent purpose provide a sufficient basis for addressing Adelphia's claim that the rule is arbitrary and capricious.

The Commission also argues that Adelphia's challenge to the retroactive application of this rule is not ripe, and here the Commission is at least partially correct. Adelphia suggests that the new rule may subject operators to retroactive rate rollbacks and to refund liability for rates charged before the Commission changed the rule, but points to no evidence suggesting the FCC has applied or intends to apply the rule in the manner that Adelphia claims to fear. *See Public Citizen v. NRC*, 940 F.2d 679, 682–83 (D.C.Cir.1991). Although the Commission has elsewhere required Adelphia to justify a rate it has charged since September 1993, it did so only after concluding that the a la carte offering in question "clearly" constituted a regulatory evasion even under the old rule. *Adelphia Cable Partners, L.P., South*

*Dade County, Florida*, DA 94–1277 ¶¶ 18–23; *Adelphia Cable Partners, L.P., South Dade County, Florida*, FCC 95–378 ¶ 21 (Dec. 1, 1995) (affirming based upon initial Rate Order). In other words, the Commission is not applying its new rule in that case.

We do, however, find Adelphia's retroactivity challenge ripe to the extent that it is based not upon possible refund liability, but upon the defeated expectations of cable system operators who created premium programming packages in the belief that they could charge unregulated rates. We address that challenge in § II.B.2.(b) below.

■ *2. Arbitrary and Capricious Rulemaking.* Adelphia argues that the small-number rule, 47 C.F.R. § 76.986(c)(2), rests upon "the FCC's [implicit] assumption that cable operators who unbundled more than a 'small' number of channels [between April 1993 and September 1994] should have known that their actions would be deemed an 'evasion' of the FCC's rules," and that the rule is arbitrary and capricious because the underlying assumption is irrational. Adelphia's argument is itself, however, based upon an implicit assumption, *viz.*, that rate regulation of premium packages is a sanction imposed by the Commission upon operators who had acted in bad faith under the *ancien regime* of the Second Order on Reconsideration.

The purpose of the rate regulation instantiated in the Sixth Order on Reconsideration is clearly remedial rather than punitive. It turns not upon the cable operator's state of mind but upon the likelihood that the operator's actions seriously compromised the goals of the Act. The Commission defines "evasion" not in terms of the operator's intent, but in terms of its conduct, as "any practice or action which avoids the rate regulation provisions of the Act or our rules contrary to the intent of the Act or its underlying policies." *Rate Regulation*, MM Dkt. No. 92–266 ¶ 451 (Rate Order, May 1993). With the understanding that the Commission's interest lies in achieving its regulatory objectives rather than in punishing bad faith, the basis for the small number rule is apparent.

Having encountered practical difficulties in administering its original regulation, the

Commission dropped the exemption of premium packages and classified them as cable programming service tiers. Sixth Order on Reconsideration at ¶¶ 42–53; 47 C.F.R. § 76.986(a). In other words, unless a cable system can demonstrate that it faces "effective competition," the FCC will ensure that the operator does not charge an "unreasonable" rate for any regulated tier. 47 U.S.C. § 543(c); 47 C.F.R. § 76.906. In the case of a "new product tier," however, the FCC decided to treat as reasonable whatever rate the operator charges. 47 C.F.R. § 76.987.

The Commission's willingness in effect to presume that the rate is reasonable in any case in which "the operator had reasonable grounds to believe the collective offering involving only a small number of migrated channels complied with the Commission's requirements as of the date it was first offered," 47 C.F.R. § 76.986(c)(2), manifestly reflects the agency's desire to balance equity and regulatory purpose. *See* Sixth Order on Reconsideration at ¶ 51. Whether a cable operator had reasonable grounds to believe that an a la carte package met the Commission's former criteria for unregulated treatment bears not only upon its subjective good faith but also upon the likelihood that it's offerings significantly compromised the purpose of the regulatory regime. Although the former rule proved generally unworkable, it is not unreasonable for the agency to suppose that the most egregious transgressors were also the most obvious. In other words, the Commission could reasonably suppose that cases in which the package was "not clearly ineligible" for the exemption, *id.*, and in which few channels had been moved from regulated tiers to unregulated a la carte offerings, are likely to be the cases in which the Commission's regulatory goals were least infringed. "[Seeing] little reason to require an operator to reverse migrate" in these cases, *id.*, the Commission has indulged its equitable instincts. We see nothing arbitrary or capricious in that.

■ *3. Retroactive Application.* Adelphia argues that application of the small-number rule to premium packages created between April 1993 and September 1994 impairs substantive rights of cable system operators who created such packages in reliance upon the regulatory regime established by the Commission's initial Rate Order and elaborated upon in its Second Order on Reconsideration. The express premise of this argument is that nothing the Commission did or said prior to its Sixth Order on Reconsideration gave the operators any indication that future regulatory exemption would depend upon the number of channels that an operator had shifted from regulated to unregulated status. At that level of specificity, however, the premise is trivial.

Starting with the initial Rate Order the Commission clearly expressed its concern that exempting premium packages from regulation would create opportunities for regulatory avoidance inconsistent with the goals of the Cable Act. Rate Order ¶ 328 n.808. For this reason the Commission warned that a premium package would not be exempt from regulation unless the operator's a la carte offering was a "realistic service choice," and the Commission retained discretion to determine whether any particular offering met this standard. *Id.* Further, acknowledging the difficulty of anticipating evasive stratagems, the Commission reminded operators that it has a statutory mandate "periodically [to] review and revise [its] regulations on evasion." Rate Order at ¶ 451.

From the outset, therefore, cable system operators had notice that the Commission might change the rules in order to address evasive conduct. By the time of the Sixth Order on Reconsideration, because experience had taught the Commission that the problem of evasion was too great to be handled under the regime of the Second Order on Reconsideration, the Commission changed the rules. If the cable operators had disregarded the possibility of a rule change, then they misread the Commission from the outset; that does not give them an "equitable claim" against application of the new rule. *New England Tel. & Tel. Co. v. FCC*, 826 F.2d 1101, 1110 (D.C.Cir.1987).

### III. Conclusion

We agree with the Commission that the Cable Act, 47 U.S.C. § 543, authorizes the agency to regulate the rates that a cable

**1258**

operator may charge for a discounted package of video programming that it also offers a la carte, and we find nothing arbitrary or capricious about the small-number rule that the Commission adopted in order to implement that provision of the statute. To the extent that Adelphia's objection to retroactive application of the rule is ripe, *supra* § II.B.1(b), the rule does not impair any substantive right upon which Adelphia was entitled to rely. Finally, having failed to raise its constitutional objection to this rule before the Commission, Adelphia cannot raise it here. It follows that Adelphia's petition must be

*Denied.*