133 F.3d 34
 328 U.S.App.D.C. 171, Util. L. Rep. P 14,185
 SOUTHEASTERN MICHIGAN GAS COMPANY and Michigan Gas Company, Petitioners
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent
Northern States Power Company (Minnesota), et al., Intervenors
 Nos. 96-1200, 96-1207, 96-1211, 96-1213, 96-1216, 96-1307,
96-1324,96-1366, 96-1376, 96-1377, 96-1412,
96-1441, & 97-1079.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 13, 1997.
Decided Jan. 16, 1998.
 
 Clinton A. Vince argued the cause for joint petitioners and supporting intervenors, with whom Deborah A. Swanstrom, Emmitt C. House, Mary Ann Walker, Neil L. Levy, David I. Bloom, Randall B. Palmer, Shaheda Sultan, Elizabeth W. Whittle, Gordon J. Smith, Ronald N. Carroll, Charles H. Shoneman, Eileen G. Stanek, David D'Alessandro, Kelly A. Daly, Thomas L. Casey, Solicitor General, State of Michigan, Don L. Keskey and Henry Boynton, Assistant Attorneys General, Frederick J. Killion, Allan W. Anderson, Jr., and David B. Ward were on the joint briefs.
 Deborah A. Moss argued the cause for petitioner Consumers Energy Company, with whom William M. Lange was on the briefs.
 Frederick J. Killion argued the cause for petitioners Northern States Power Company, et al., with whom John H. Burnes, Jr., and Theresa I. Zolet were on the briefs.
 Philip F. Cronin, Jr. argued the cause for petitioner Rochester Gas and Electric Corporation, with whom Elizabeth W. Whittle was on the briefs.
 William W. Brackett argued the cause for petitioner Midland Cogeneration Venture Limited Partnership, with whom Terry O. Brackett was on the briefs.
 Joel M. Cockrell, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent, with whom Jay L. Witkin, Solicitor, and John H. Conway, Deputy Solicitor, were on the brief.
 James D. McKinney, Jr., argued the cause for intervenor Great Lakes Gas Transmission Limited Partnership, with whom G. William Stafford and John J. Wallbillich were on the brief.
 Allan W. Anderson, Jr., argued the cause for intervenors in support of respondents, with whom David B. Ward, Shaheda Sultan, Charles H. Shoneman,and Elizabeth W. Whittle were on the brief.
 Before: EDWARDS, Chief Judge, GINSBURG and SENTELLE, Circuit Judges.
 SENTELLE, Circuit Judge:
 
 
 1
 This case grows out of a long-running dispute between the Great Lakes Gas Transmission Partnership ("Great Lakes"), various factions of its shippers, and the Federal Energy Regulatory Commission ("FERC"). We first reviewed FERC's resolution of this matter in TransCanada PipeLines Ltd. v. FERC, 24 F.3d 305 (D.C.Cir.1994), where we remanded the case to FERC for further consideration. On remand, FERC abandoned its initial position and issued new orders adverse to the parties that had prevailed in the pre-TransCanada administrative proceedings. We now consider whether FERC's latest ratesetting orders concerning the Great Lakes Natural Gas Transmission Pipeline complied with Section 4 of the Natural Gas Act ("NGA"), see 15 U.S.C. § 717c, and were not otherwise arbitrary and capricious.
 
 I.
 
 2
 FERC orders issued in 1989 and 1990 authorized Great Lakes, which already operated a 2,000-mile interstate pipeline, to build a series of mainline loops that substantially enlarged the system's shipping capacity and that increased its rate base from $202 million to $953 million. FERC traditionally approved pipelines' proposals to roll expansion costs into their general rates (thereby allocating expansion costs to all users pro rata regardless of the extent to which they use the new facilities) so long as the pipeline could show both that the system was integrated and that qualitative benefits accrued to all customers as a consequence of the expansion. See TransCanada, 24 F.3d at 308 (citing Great Lakes Gas Transmission Co., 45 FERC p 61,237, 61,695 (1988)); Great Lakes Gas Transmission L.P., 57 FERC * 37 61,140, 61,520 (1991), reh'g denied, 62 FERC p 61,101, 61,713 (1993). When FERC reviewed Great Lakes' proposal, however, it abruptly abandoned its traditional standard (called the "Battle Creek test" after the case in which we first approved of its application, see Battle Creek Gas Co. v. FPC, 281 F.2d 42 (D.C.Cir.1960)). Rather than the two-part Battle Creek test, FERC applied a "commensurate benefits" test, in which it compared the cost of expansion with the benefits accruing to existing users. 57 FERC at 61,520-21. Because it found that construction costs far exceeded any consequent benefit to existing users, FERC ordered Great Lakes to price its services incrementally (i.e., recovering expansion costs only from those customers that use the new facilities ("expansion shippers")). See 57 FERC at 61,512; Great Lakes Gas Transmission L.P., 57 FERCp 61,141, 61,534 (1991), reh'g denied, 62 FERC p 61,102,61,731 (1993). The expansion shippers petitioned this court for relief, claiming that FERC's orders were arbitrary, discriminatory, impermissibly retroactive, and issued in violation of the Administrative Procedure Act. See TransCanada, 24 F.3d at 307.
 
 
 3
 We held that FERC failed to provide a "reasoned explanation" for having abandoned the Battle Creek test and remanded the case. See 24 F.3d at 310. While not holding that the commensurate benefits test was itself invalid, we nonetheless found that FERC's sudden abandonment of Battle Creek required more elaborate explanation and more substantial consideration of the consequences.[1] See id. at 311.
 
 
 4
 On remand FERC again altered its course. Rather than elaborate its rationales for adopting the commensurate benefits test, FERC reverted to the Battle Creek test and held that rolled-in pricing would be more equitable than incremental pricing. See Great Lakes Gas Transmission L.P., 72 FERC p 61,081, 61,423 (1995). FERC's Chair dissented, arguing that the outcome was inequitable and not mandated by TransCanada. See id. at 61,431-33. The FERC majority justified its return to Battle Creek by finding that the expansion parties had reasonably relied at the time of construction on an expectation that FERC would apply the Battle Creek standard. See id. at 61,427. FERC concluded that its initial decision to apply a commensurate benefits test was "legal error" and ordered "Great Lakes to refund to the expansion shippers the principal amounts that they paid in excess of the lawful systemwide rolled-in rate.... [FERC also] permit[ted] Great Lakes to impose offsetting surcharges on the pre-expansion shippers." Id. at 61,430. FERC found that, in the interests of equity, interest charges should not apply retroactively (though a dispute exists over when interest began to accumulate). See id.
 
 
 5
 Nonexpansion customers filed a petition for rehearing. FERC rejected the petition, see Great Lakes Gas Transmission L.P., 75 FERC p 61,089, 61,268 (1996), affirming its earlier decision, reemphasizing the significance of the expansion shippers' reliance interest in the application of the Battle Creek standards, and permitting Great Lakes to retain a $15.7 million difference between surcharges and refunds. Id. (The surplus was later recomputed to be $17.5 million. See Great Lakes Gas Transmission L.P., 76 FERC p 61,157, 61,935 n. 29 (1996).) Furthermore, FERC clarified that rolled-in pricing applied to all nonexpansion shippers, regardless of the nature of their shipping contracts. See 75 FERC at 61,293-94. FERC's Chair again dissented. FERC later granted Great Lakes' motion to clarify the interest provisions of the earlier orders, see 76 FERC p 61,926, and held, among other things, that interest began to accrue on all surcharges on October 1, 1995, when rolled-in rates took effect. Id. at 61,936-38. Various parties now petition for review of nearly every element of FERC's orders.II.
 
 
 6
 In TransCanada, we remanded the case to FERC to permit it to elaborate its factual findings and to explain its decision to apply the commensurate benefits test retroactively. See TransCanada PipeLines, 24 F.3d at 310-11; cf. Checkosky v. SEC, 23 F.3d 452, 465 (D.C.Cir.1994) (Silberman, J., concurring) (stating that remand without vacating is proper when court is "unsure and [wants] ... clarification of [the agency's] position and the rationale therefor"). On remand, FERC abandoned the commensurate benefits test and readopted the Battle Creek test. Natural Gas Pipeline of America and a number of other natural gas shippers (collectively "Natural") challenge both FERC's authority to return to the Battle Creek test and its application thereof.
 
 A.
 
 7
 Natural initially contends that FERC's decision to readopt the Battle Creek test was arbitrary and capricious because it misinterpreted TransCanada's mandate, arguing that in TransCanada we remanded solely to permit FERC to clarify its reasoning. While Natural is correct that the remand provided that option, once FERC reacquired jurisdiction, it had the discretion to reconsider the whole of its original decision. See Radio Television S.A. de C.V. v. FCC, 130 F.3d 1078, 1082-83 (D.C.Cir.1997). We therefore reject Natural's contention that FERC misunderstood the ambit of its authority following the TransCanada remand.
 
 
 8
 Natural next argues that FERC lacked substantial evidence to support its finding that Great Lakes and the expansion shippers had a settled expectation that FERC would apply the Battle Creek test to its review of their Section 4 ratesetting petition. Natural again misunderstands FERC's position. FERC does not purport to have made factual findings regarding the parties' reliance interests. Rather, FERC inferred from the significant costs incurred by Great Lakes in building the expansion facilities that it and the expansion shippers anticipated application of Battle Creek at the time that they undertook construction. See 75 FERC at 61,274 & n. 40. Because such a conclusion is not a factual finding, it did not require specific evidentiary underpinnings. Thus, we adopt the same standard of review we applied in Adelphia Comm. Corp. v. FCC, 88 F.3d 1250 (D.C.Cir.1996), where we reviewed a Federal Communications Commission presumption that was premised upon Commission experience rather than factual findings to ensure that it was not arbitrary or capricious.
 
 
 9
 According to Natural, FERC's invocation of the reliance rationale was an abuse of discretion because the expansion shippers could not reasonably have relied either on the outcome of administrative proceedings or on the standard that would be applied. FERC did not premise readoption of Battle Creek on the expansion shippers' reliance upon the outcome of the Battle Creek test; it merely concluded that the expansion shippers were entitled to rely on their expectation that FERC would apply that test to Great Lakes' Section 4 petition. Thus, we review only FERC's justification of its return to Battle Creek on that basis. The nonexpansion parties' objection to FERC's invocation of the reliance rationale is without foundation. In a long line of cases beginning with Retail, Wholesale & Dep't Store Union v. NLRB, 466 F.2d 380 (D.C.Cir.1972), we have held that, in some circumstances, parties are entitled to rely on the consistent application of administrative rules. See, e.g., Williams Natural Gas Co. v. FERC, 3 F.3d 1544, 1554-55 (D.C.Cir.1993). So long as courts are permitted to consider parties' reliance on old rules in determining whether the retroactive application of a new rule is arbitrary and capricious, it follows that agencies may consider the benefits of doctrinal stability when deciding whether to apply new rules retroactively.
 
 
 10
 Natural also contends that Great Lakes and the expansion shippers were on notice of pending changes to FERC's rate design policy, see Pricing Policy, 75 FERC p 61,105, when they decided to build their new facilities and that such knowledge bars them from now claiming that they relied on the application of the Battle Creek test. In fact, there was no notice of pending changes in the applicable standard (or at least none to which we have been referred) at the time of the original Section 7 proceeding, and notice of imminent administrative recalibration therefore cannot be the basis for challenging the reliance rationale in this instance. Compare Chadmoore Comm., Inc. v. FCC, 113 F.3d 235, 240 (D.C.Cir.1997) (noting that adjudication under review was part of broader--and already publicized--plan to modify the distribution of construction licenses).
 
 
 11
 Finally, Natural asserts a vague claim that FERC violated the pre-expansion shippers' constitutional rights by inducing the very reliance upon which FERC ultimately justified application of the Battle Creek test. Before Great Lakes began construction of the expansion facilities, some pre-expansion shippers moved FERC to consolidate Great Lakes' Section 7 permitting and Section 4 ratesetting proceedings. FERC refused and instead granted the construction permits and deferred ratesetting until after construction was complete. See Great Lakes Gas Transmission L.P., 48 FERC p 61,127 (1990); Great Lakes Gas Transmission L.P., 48 FERCp 61,273 (1989). Natural claims that FERC's decision to permit construction prior to resolution of the rate issue, coupled with its later invocation of the reliance rationale, made the outcome of the Section 4 proceeding a foregone conclusion and thereby denied the nonexpansion shippers a meaningful hearing.
 
 
 12
 Not only does Natural fail to refer us to any applicable constitutional provision, but it also mistakes FERC's conclusion that Great Lakes relied on the application of Battle Creek for a finding that Great Lakes relied on the outcome of the Battle Creek test. Even if FERC's disaggregation of the Section 4 and Section 7 proceedings induced the expansion shippers to rely on application of the Battle Creek test, FERC's invocation of the reliance rationale was wholly unrelated to its disposition of the merits of Great Lakes' petition. In short, Natural does not refer us to any procedural irregularity in its application, let alone any procedural or substantive shortcoming of constitutional dimension in FERC's hearings.
 
 
 13
 FERC's readoption of the Battle Creek test was a permissible exercise of administrative discretion, and we therefore turn to whether FERC correctly applied the test.
 
 B.
 
 14
 Natural further contends that even if FERC was entitled to readopt Battle Creek, FERC erred in its application of the test.[2] While our standard for reviewing ratesettings is deferential, see Time Warner Entertainment Co. v. FCC, 56 F.3d 151, 163 (D.C.Cir.1995), cert. denied, 516 U.S. 1112, 116 S.Ct. 911, 133 L.Ed.2d 842 (1996), it is "not ... an empty gesture." Northern States Power Co. v. FERC, 30 F.3d 177, 180 (D.C.Cir.1994); see Tarpon Transmission Co. v. FERC, 860 F.2d 439, 442 (D.C.Cir.1988) (stating that we will not "rubberstamp[ ] unsupported, and perhaps unsupportable, agency decisions").
 
 
 15
 The Battle Creek test permits rolled-in pricing when expansion facilities are part of an integrated pipeline system and when the expansion provides system-wide benefits, such as additional capacity, increased reliability, or enhanced expansibility. See Battle Creek, 281 F.2d at 47. Section 4 of the NGA, pursuant to which FERC has the authority to regulate natural gas sales and transportation pricing, mandates "just and reasonable" rates. 15 U.S.C. § 717c(a). Natural and FERC disagree over whether application of the Battle Creek test in this instance generated "just and reasonable" rates. Natural argues both that FERC neglected to satisfy its statutory obligation to ensure the equity of its orders and that, even if the rates in question here were reasonable, FERC's application of the test was infected with error.
 
 
 16
 Natural claims at the outset that FERC failed to comply with its statutory mandate to ensure "just and reasonable rates" because its application of Battle Creek was mechanical and failed to consider the equity of the additional costs with which the nonexpansion parties would be saddled after rates were rolled in. Although Natural is, of course, correct that all FERC ratemaking is "subject to the statutory 'fair and equitable' standard," ANR Pipeline Co. v. FERC, 71 F.3d 897, 902 (D.C.Cir.1995), fairness and equity do not require FERC to compute the actual costs and benefits accruing to each shipper before approving or modifying proposed rates. See TransCanada, 24 F.3d at 309.
 
 
 17
 Natural argues that our decision in Algonquin Gas Transmission Co. v. FERC, 948 F.2d 1305 (D.C.Cir.1991), mandates that FERC compute quantitative costs and benefits in determining the equity of a rate scheme and that because FERC did not consider the actual costs and benefits associated with the expansion facilities, its decision was arbitrary and capricious. The Algonquin opinion is composed of two parts. In the first section of the opinion, which addressed the proposed roll-in of facilities expansion costs, we held that when FERC imposes rates of its own design (rather than merely reviewing those submitted by the parties) under Section 5 of the NGA, see 15 U.S.C. § 717d, it must "offer more than a conclusionary statement that the existence of systemwide benefits renders it unjust to allocate facilities costs incrementally." Id. at 1313. We held that FERC must "show[ ] that the incremental facilities produce specific, system-wide benefits...." Id. at 1314. FERC's remand orders in the present case reviewed the various benefits that would accrue to all users from Great Lakes' expansion, and FERC thereby satisfied this element of Algonquin. See 75 FERC at 61,280-83.
 
 
 18
 As both parties noted at oral argument, our decision in TransCanada seems in some tension with the second section of Algonquin. In that portion of Algonquin, we addressed FERC's decision to permit the roll-in of increased gas costs caused by increased demand from new customers and the gas company's consequent use of higher-priced suppliers. We held that where FERC rejects the parties' pricing scheme and instead mandates a pricing plan that causes existing customers to pay more for service that is unchanged from that which they received before the ratemaking, FERC must "explicitly consider the cost shifting that its order might effect." Algonquin, 948 F.2d at 1315. In TransCanada, we stated that:
 
 
 19
 Algonquin undoubtedly does require a reasonably specific qualitative description of the systemwide benefits of an integrated facility. But the Court was careful not to require a balancing of costs and benefits (much less a quantification thereof), and indeed confirmed that the general test for rolling-in was the same that Great Lakes discerns in Commission precedent [relying on Battle Creek].
 
 
 20
 TransCanada, 24 F.3d at 309. Our TransCanada holding therefore seems to accentuate the first Algonquin holding to the detriment of the second. The two holdings, however, are reconcilable upon consideration of their underlying factual bases.
 
 
 21
 In Algonquin, we held that FERC had to consider the costshifting effect of its order because existing users in that case got no benefit in exchange for increased rates. See Algonquin, 948 F.2d at 1314-15. When FERC approves a rate application under the Battle Creek standard, it must have found that expansion provided existing users with qualitative benefits. See TransCanada, 24 F.3d at 308 (pointing out the two Battle Creek prongs). Thus, where no discernable difference existed between pre- and post-expansion service, FERC was obligated to consider the cost shifting implicit in its order, see Algonquin, 948 F.2d at 1315, but where benefits accrue to nonexpansion customers, there is no cost shifting--rather, existing users merely are being charged for the quantum of the new facilities and its attendant benefits attributable to their demand. The second part of Algonquin involved a roll-in of gas costs rather than facilities costs, and the result in Algonquin depends critically upon the unique nature of gas as a fungible commodity. In most ratesettings, including the one currently before us, changes to an integrated system's facilities lead to qualitative improvements in service to all customers, and the Battle Creek test will apply. The cost-shifting portion of Algonquin therefore is consistent with the Battle Creek requirement that a transporter show qualitative benefits that accrue to existing users before rolling in expansion costs. Compare id. with Battle Creek, 281 F.2d at 47-48.
 
 
 22
 As for Natural's claim that the statute requires a specific finding that rates are equitable, FERC addressed the question when it noted that:
 
 
 23
 Under the Battle Creek test, once facilities are found to be integrated into the mainline system and to provide a positive benefit to all customers, the costs of those facilities are considered to be part of the pipeline's cost of serving all its customers. That is because the demand of all customers for system capacity creates the need for system expansion.
 
 
 24
 75 FERC at 61,284 (emphasis added). Because every shipper is economically marginal, the costs of increased demand may equitably be attributed to every user, regardless when it first contracted with the pipeline. See 1 Alfred E. Kahn, The Economics of Regulation 140 (1970). Thus, when an expansion is both integrated and to the benefit of existing users, FERC is not bound to study the quantitative effect of rolling in construction costs.
 
 
 25
 Natural next contends that FERC's application of the Battle Creek test was infected with bad faith (and is therefore arbitrary and capricious) because the remand orders' findings contradict FERC's pre-TransCanada findings on the same factual record. FERC responds that whatever tension exists between its original findings and those it made on remand reflects only that the Battle Creek standard is less exacting than the commensurate benefits test. Natural refers the court specifically to four of FERC's findings: reliance, cross-subsidization, efficiency, and capacity. The first three findings may be dealt with summarily because it is plain that any alleged contradictions are the direct consequence of FERC's readoption of the more lenient Battle Creek standard on remand. For example, on the cross-subsidization findings, while Natural is correct that FERC initially found impermissible cross-subsidization, the standard applied on remand required only that the expansion parties show some qualitative improvement to satisfy the system-wide benefits element of the Battle Creek test. On both a theoretical and practical basis, it is perfectly possible for both cross-subsidization and system-wide benefits to exist on the same facts. Indeed, both can logically be said to occur any time that a system change benefits all customers but to differing degrees. Thus, the first series of orders' finding of cross-subsidization is not inconsistent with the remand orders' finding that some qualitative system-wide benefits may accrue to all shippers.
 
 
 26
 The fourth alleged contradiction, which concerned FERC's findings regarding system capacity, gives us greater pause--indeed FERC's own counsel conceded at oral argument that "[m]aybe [FERC] misspoke a little on capacity." In its original orders, FERC found that "it has not been shown that the additional capacity will inure to the benefit of existing customers by providing additional interruptible and overrun ["I/O"] capacity." 57 FERC at 61,524. In the remand orders, however, FERC made two capacity-related findings: (1) expansion "will accommodate greater variation in demands on the system," and (2) it will "increase the opportunity for overrun and interruptible service for all of Great Lakes' customers." 72 FERC at 61,428. FERC's first finding on remand is not inconsistent with its original findings. That additional I/O capacity does not exist does not necessarily imply that the system could not accommodate greater variation in demand (e.g., increased ability to moderate supply when undertaking maintenance). See 75 FERC at 61,281. As for the second finding, FERC supports its conclusion with specific references to the testimony of one of Great Lakes' experts, Mr. Elkouri. Mr. Elkouri testified that the expansion facilities increase capacity for existing users. And that is, of course, true--increased demand with no increase in capacity would decrease every shipper's capacity to use the pipeline at some point (no contract is perpetual), and to the extent that there is greater capacity, there is consistently more opportunity for its use by I/O shippers (regardless of projected load, intermittent capacity will inevitably arise). Whatever apparent contradictions are embedded in the record are therefore the product of a change in the governing legal standard and of FERC's reexamination of the administrative record. See Troy Corp. v. Browner, 120 F.3d 277, 283 (D.C.Cir.1997) ("we only determine whether the decision was arbitrary and capricious, or otherwise contrary to law. In so doing, we examine whether the decision was based on the relevant factors and was not 'a clear error of judgment.' " (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823-24, 28 L.Ed.2d 136 (1971))).[3]
 
 III.
 
 27
 After it had applied the Battle Creek test and concluded that Great Lakes' proposal to roll in expansion costs was reasonable, FERC found that the expansion shippers should be refunded the difference between the amount they were charged when rates were incremental and that which they would have been charged if expansion costs had been rolled in. FERC therefore required Great Lakes to reimburse the expansion shippers for their excess costs and permitted Great Lakes to charge nonexpansion shippers an offsetting surcharge. FERC further held that interest accrued on refunds and surcharges only as of October 1, 1995, when rolled-in prices took effect.
 
 A.
 
 28
 Natural contends that FERC improperly awarded the expansion shippers a retroactive remedy because of a mistaken belief that its original orders were infected with legal error. See, e.g., 72 FERC at 61,430. According to Natural, because TransCanada did not mandate readoption of the Battle Creek test, the original FERC orders were not "erroneous," and on remand, FERC was free to choose any pricing scheme. Thus, contrary to FERC's orders, the expansion parties were not "entitled" to be "made whole," and FERC was not authorized to impose a retroactive remedy.
 
 
 29
 Natural misapprehends the nature of FERC's original error. Regardless of whether incremental rates could have been justified, they were not. FERC's failure to explain itself was itself error, see TransCanada, 24 F.3d at 309-10, and the rates it imposed without adequate reasoning therefore were invalid. Thus, although Natural is correct that incremental rates were not per se impermissible, their application was erroneous in this case. And because FERC may "undo what [was] wrongfully done by virtue of [a prior] order," United Gas Improvement Co. v. Callery Properties, Inc., 382 U.S. 223, 229, 86 S.Ct. 360, 364, 15 L.Ed.2d 284 (1965), its decision to approve a retroactive remedy was within its discretion. See Natural Gas Clearinghouse v. FERC, 965 F.2d 1066, 1073-74 (D.C.Cir.1992) (noting presumption in favor of retroactive remedies for erroneous FERC decisions).
 
 B.
 
 30
 In its July 26, 1995, Order, FERC held that "refunds and surcharges shall not include interest." 72 FERC at 61,430. FERC permitted non-expansion parties to amortize their payments, but if they chose amortization, they were liable for interest "for the amortization period." Id. FERC declined to require interest for the entire period because it hoped to "ease the adverse effects of [its] legal error on non[expansion] shippers, while also ensuring that Great Lakes is kept whole." 75 FERC at 61,294. Great Lakes moved for clarification of whether interest accumulated on all balances from October 1, 1995 (when rolled-in rates took effect) or whether it did not begin to accumulate until 90 days after Great Lakes' amended compliance filing, which occurred roughly ten months later. See 76 FERC at 61,937. FERC held that it intended only to exclude the accrual of interest until October 1, 1995. Interest accumulated every day after that, regardless of whether payment was ultimately lump-sum or amortized. Id. Petitioners challenge both FERC's interest exemption and its imposition of interest on all payments made after October 1, 1995.
 
 
 31
 Midland Cogeneration Venture Limited Partnership ("MCV"), one of the expansion shippers, asserts that FERC's decision to deny interest on the period prior to October 1, 1995 was legal error and was an abuse of discretion. 15 U.S.C. § 717c(e), provides that
 
 
 32
 the Commission may, by order, require the natural-gas company to furnish a bond, to be approved by the Commission, to refund any amounts ordered by the Commission, to keep accurate accounts in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts were paid, and, upon completion of the hearing and decision, to order such natural-gas company to refund, with interest, the portion of such increased rates or charges by its decision found not justified.
 
 
 33
 MCV claims that FERC misread this statutory provision to permit it discretion in the award of interest. See MCV br. at 4. MCV contends that while the award of remedial damages is discretionary, the imposition of interest is not. Thus, as MCV reads the statute, the auxiliary verb "may" serves "order" but not "with interest," which itself modifies only "refund." See 15 U.S.C. § 717c(e). Second, MCV refers the court to FERC's own regulations, which state that:
 
 
 34
 Any natural gas company that collects rates or charges ... must refund that portion of any increased rates or charges ... found by the Commission not to be justified ... together with interest as required in paragraph (d) of this section.
 
 
 35
 18 C.F.R. § 154.501(a)(1). Paragraph (d) requires that interest be computed from the date of collection to the date of refund. Id. at § 154.501(d). FERC argues that the statute gives it discretion whether to award interest and that case law supports its authority not to award interest. See Estate of French v. FERC, 603 F.2d 1158, 1162-63 (5th Cir.1979).
 
 
 36
 There is no doubt that section 717c(e) is ambiguous--indeed if read literally, the clause would permit FERC "by order[ ] [to] require the natural gas company ... to order such natural gas company to refund, with interest, the portion of such increased rates ... found not justified." 15 U.S.C. § 717c(e) (emphasis added). Because the statute is at best unclear (and at worst incomprehensible), obedient to Chevron U.S.A., Inc. v. NRDC, 467 U.S. 837, 843, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984), we defer to the agency's reasonable interpretation, which in this case is embodied in 18 C.F.R. § 154.501.
 
 
 37
 FERC, however, ignored its own regulation when interpreting the statute. As we have previously held, "[t]he Commission may not ... rely solely on its equitable discretion to justify straying from well-established rules and procedures. [It] must articulate valid reasons for its departure." FERC v. Triton Oil & Gas Corp., 750 F.2d 113, 116 (D.C.Cir.1984). In the instant case, FERC decided to exclude interest payments because it sought to "ease the adverse effects on the pre-expansion shippers of [its] legal error, while also ensuring that Great Lakes is kept whole." 72 FERC at 61,430. In its disposition of the interest issue, FERC did not mention its regulation governing refunds and surcharges. Because FERC failed to give a "valid reason[ ] for ... depart[ing] [from the regulation]," Triton Oil, 750 F.2d at 116, its decision to exempt the nonexpansion shippers from paying interest for the whole period was error. Furthermore, because FERC has had ample opportunities to resolve this matter on its own but has neither heeded its own regulation nor explained its failure to do so, we reverse FERC's decision to exempt the refunds and surcharges from interest assessments and hold that interest shall be assessed on all surcharges for the entire period that incremental rates were in effect. Because we decide this matter in favor of MCV, we need not consider Natural's petition challenging FERC's decision to require interest on all payments made after October 1, 1995.
 
 IV.
 
 38
 In 1991 FERC held that Great Lakes' proposal to price I/O service at $0.275 per thousand cubic feet ("Mcf"), which reflected a 100 percent load factor rate (i.e., equivalent to the rate paid by shippers with firm contracts), was unreasonable because "the maximum [load factor] rate is always higher than needed to ration daily usage." 57 FERC at 61,548. FERC instead fixed the I/O rate at a 140 percent load factor or $0.16 per Mcf. See id. at 61,547-49. In the remand orders, FERC retroactively modified the I/O rate, applying the 140 percent load factor to the full rolled-in price and consequently imposed $0.10 per Mcf surcharge for I/O service prior to the rolling in of expansion costs. The resulting price for I/O service, $0.26 per Mcf, was only $0.015 lower than the price rejected by FERC in 1991.[4] In its remand orders, FERC held that when I/O shippers agreed to pay the "maximum rate" in their contracts and were aware of the pending Section 4 proceedings, their final rates were contingent on the outcome of the underlying rate proceedings. See 75 FERC at 61,297.
 
 
 39
 Northern States Power ("NSP") and other I/O shippers assert on appeal that FERC's decision was arbitrary and capricious because it conflicts with the earlier FERC finding that $0.275 was "too high at all times" and because the I/O shippers' contracts with Great Lakes do not permit retroactive modification. FERC never held that $0.275 per Mcf was per se excessive. Rather, FERC decided in 1991 that a 100 percent load factor rate was too high; the consequent price per Mcf was incidental. NSP confuses the rate that it pays (i.e., the price per Mcf) with the load factor according to which the price is computed. In its remand orders, FERC imposed a surcharge on the basis of a load factor of 140 percent, which is consistent with its 1991 decision. See 76 FERC at 61,934 ("Great Lakes' interruptible rate for all periods is volumetric, and the only issue is what that volumetric rate should be."). As to whether the I/O shippers' contracts with Great Lakes permitted retroactive changes in pricing, we defer to FERC's reasonable interpretation of contracts within its jurisdiction. See Williams, 3 F.3d at 1549. FERC's decision that the I/O shippers' agreement to pay the "maximum rates plus all applicable surcharges," see 76 FERC at 61,934, subjected them to retroactive surcharges is eminently reasonable. See Clearinghouse, 965 F.2d at 1075-76.
 
 V.
 
 40
 Between 1991 and 1994, Great Lakes received three Section 7 certificates to build facilities to serve Rochester Gas & Electric ("RG&E"). See Great Lakes Gas Transmission, L.P., 56 FERC p 61,052 (1991); Great Lakes Gas Transmission, L.P., 56 FERC p 61,051 (1991); Great Lakes Gas Transmission, L.P., 66 FERC p 61,115 (1992). The third order is not at issue here. Both certificates issued by FERC stated that RG&E would be liable for "the currently effective maximum applicable FT rate." 76 FERC at 61,929 (internal quotations omitted); see 56 FERC at 61,205, 56 FERC at 61,210. The second order also stated that "[t]he initial rate ... shall be subject to the Commission's final determination in Docket Nos. RP89-186-000 and RP90-20-000." 56 FERC at 61,210. Despite the different wording of the orders, they were consolidated into a single contract, which provided that RG&E would "pay ... the rates and charges in effect from time to time under Rate Schedule FT, or any effective superseding rate schedule...." Rate Schedule FT was defined elsewhere in the contract as the "FERC Gas Tariff ... as filed with the Commission and as changed and adjusted from time to time by [Great Lakes] in accordance ... with any final Commission order affecting such rates." 76 FERC at 61,931.
 
 
 41
 In the remand orders, FERC held that because RG&E's rate was contingent on the current FT price, the pending proceedings applied retroactively to RG&E as if it were a pre-expansion shipper. See 76 FERC at 61,928-29. On appeal, RG&E makes a series of arguments whose underlying principle is the same: the rate set in the underlying orders and contract was not contingent, and retroactive application of the rolled-in rate therefore is impermissible. Resolution of that issue turns upon the meaning of the phrase "maximum FT rate" in RG&E's contract with Great Lakes and in FERC's certificate orders authorizing service. "FERC's interpretation of [a] contract[ ] [within its jurisdiction] is entitled to deference under the principles articulated in Chevron ...." Williams, 3 F.3d at 1549. Thus, the agency's interpretation will be upheld "as long as [it] is reasonable." LILCO v. FERC, 20 F.3d 494, 497 (D.C.Cir.1994). The court similarly "sustain[s] the Commission's interpretation of [an][o]rder if it is reasonable." Natural Gas Clearinghouse v. FERC, 108 F.3d 397, 399 (D.C.Cir.1997).
 
 
 42
 The two certificate orders were issued on the same day, and their incorporation into a single consolidated contract suggests that the parties saw no material difference between them. Although only the second order includes a clause stating explicitly that the "authorized rate ... shall be subject to the Commission's final determination in [certain pending dockets]," 56 FERC at 61,210, FERC may reasonably have read the orders together and concluded that the more specific language of the second order clarified the ambiguity in the first order.
 
 
 43
 RG&E argues that the clause in the second order noting the reservation of the right to modify rates refers only to the cost-of-service settlement rather than to the roll-in proceedings. FERC disposed of that argument in the remand orders by finding that "the settlement [to which RG&E claims that the provision refers] expressly reserved for litigation the pricing issue ultimately resolved in the remand order [in favor of rolled-in rates]." Id. at 61,932. FERC's reading of the clause's reservation is reasonable. Where a rate is set by reference to a pending proceeding, the substance of that proceeding may reasonably be read into the order. Cf. Clearinghouse, 965 F.2d at 1075 (holding that "there could be no violation of the filed rate doctrine so long as the users of Tarpon's service received adequate notice that the rate stated in Tarpon's 1987 filing might replace the Commission-ordered rate even for service originally provided under the latter").
 
 VI.
 
 44
 In the initial order on remand, FERC mandated that Great Lakes refund expansion shippers the difference between what they had paid when rates were incremental and what they should have paid had expansion costs been rolled in. See 72 FERC at 61,430. FERC consequently permitted Great Lakes to collect an offsetting surcharge from nonexpansion shippers. See id. In a motion for rehearing, various nonexpansion shippers objected to the $15.7 million surplus (reflecting the difference between projected surcharges and refunds) that Great Lakes proposed to retain after distribution of all refunds. See 75 FERC at 61,295. FERC held that Great Lakes was entitled to retain whatever funds remained after all refunds were disbursed. See id. at 61,296. Based on revised estimates of the amount that Great Lakes would collect in surcharges, the projected surplus was later recomputed to be $17.5 million. See 76 FERC at 61,935 n. 29. RG&E and Consumers Energy Company ("Consumers") challenge Great Lakes' authority to retain the $17.5 million difference. They contend that FERC acted arbitrarily and capriciously and ignored the terms of its own orders when it permitted Great Lakes to retain the surplus.
 
 
 45
 FERC explains that "[v]irtually all of th[e] [surplus] was due to the addition of new customers after the cost-of-service rate design settlement was approved." 76 FERC at 61,935; see 75 FERC at 61,296. FERC supports that finding by reference to Great Lakes' "May 10 revised refund/surcharge plan." See id. at 61,935 n. 29. That finding is corroborated by RG&E's brief--RG&E, which was a "new customer," claims that it will be liable for an additional $8 million in surcharges. See RG&E br. at 4. Furthermore, Great Lakes' November 1, 1995 filing shows that an additional $3.7 million is attributable to additional service to ANR Pipeline. This prong of Consumers' argument is therefore a restatement of RG&E's claim. To the extent that RG&E and similarly situated petitioners agreed to rates that would incorporate the rate setting at issue in this appeal, they are apparently subject to the remand orders. See Part V. supra.
 
 
 46
 Consumers next contends that Algonquin Gas Transmission Co., 63 FERC p 61,326, 63,170 (1993), compels FERC to ensure that surcharges and refunds exactly match. Any other outcome, according to Consumers, is inconsistent with Commission policy and unsupported by sound reasoning. In its orders, FERC distinguished the situation in Algonquin from the one at issue here. See 75 FERC at 61,296. In Algonquin, FERC required exactly offsetting surcharges and refunds because "the pipeline ... failed to submit workpapers reflecting the ... rate design for the appropriate time frame, and ... generally [failed to] support[ ] its refund and surcharge calculations." Id. (citing 63 FERC at 63,180). Consumers responds that Algonquin is indistinguishable from the instant case and that the reasons for which FERC required exactly offsetting charges in Algonquin apply with equal force here.
 
 
 47
 FERC is correct that its Algonquin holding was premised upon Algonquin's inadequate explanation of its proposed surcharges and refunds. See 63 FERC at 63,180 ("We ... find Algonquin's plan more counter-intuitive and less supportable (given the paucity of explanation that has been so far provided) ... than a more straightforward, common-sense approach that provides for an equal dollar amount of refunds and surcharges."). By contrast, Great Lakes' plan and FERC's rationales for approving it explain in detail why Great Lakes should be permitted to retain the surplus. See 75 FERC at 61,296-97 (noting that the surplus is due in large part to the introduction of new services and that no party disputes Great Lakes' computations). Because FERC's distinction is reasonable, its decision to depart from Algonquin was not arbitrary or capricious.
 
 
 48
 Consumers reads the term "offsetting discharges" as a narrow mandate for Great Lakes to assess surcharges and to distribute refunds only if they were exactly offsetting. FERC's initial order permitted Great Lakes to devise the means by which rates would be assessed in order to minimize harm to Great Lakes and to place all parties in as nearly as possible the position in which they would have been absent the original imposition of incremental rates. See 75 FERC at 61,295-97. FERC's later explanation of that order should be upheld if it is reasonable. See Natural Gas Clearinghouse, 108 F.3d at 399; K N Energy, Inc. v. FERC, 968 F.2d 1295, 1299 (D.C.Cir.1992). Because the word "offset" is not unambiguous and because FERC's policy rationales support the reasonableness of its reading of "offset," its interpretation of the phrase "offsetting discharge" is valid.
 
 
 49
 Consumers' final contention is that permitting Great Lakes to retain the $17.5 million would allow it to exceed its permissible rate of return in violation of the NGA. Because FERC approved all the rate orders that contained contingent pricing schemes, the assessment did not violate the NGA. Despite Consumers' contention that a new Section 4 rate proceeding was required to increase rates to account for new service, the roll-ins were not truly retroactive--"notice ... 'changes what would be purely retroactive ratemaking into a functionally prospective process by placing the relevant audience on notice at the outset that the rates being promulgated are provisional only and subject to later revision.' " Clearinghouse, 965 F.2d at 1075 (quoting Columbia Gas Transmission Corp. v. FERC, 895 F.2d 791, 797 (D.C.Cir.1990)). Thus, as FERC points out, Consumers' disagreement with the legality of the retroactive application of the roll-in is really disapproval of the underlying rate, which, as we have already held, is permissible.
 
 Conclusion
 
 50
 For the reasons stated above, we deny all the petitions except MCV's. We grant MCV's petition and reverse FERC's decision not to award interest for the entire period to which surcharges and refunds apply. The joint petitioners also have moved to strike Addendum A of MCV's brief. Joint petitioners' motion is granted. Addendum A is beyond the scope of the issue that MCV was entitled to brief, and its content is inconsistent with Circuit Rule 28(a)(3).
 
 
 51
 So ordered.
 
 
 
 [1]
 FERC has since issued a rule that establishes a presumption in favor of incremental pricing when rolling in expansion costs would increase rates to existing customers more than five percent. See Pricing Policy for New and Existing Facilities Constructed by Interstate Natural Gas Pipelines, 75 FERC p 61,105 (1996). Because FERC issued its rule after this case had begun and did not rely on it in this proceeding, we do not consider what effect its application would have had
 
 
 [2]
 At oral argument, Natural contended that because of the affiliate relationship between Great Lakes and TransCanada Pipelines Ltd., which is also Great Lakes' largest customer and the largest expansion shipper, FERC should have exercised heightened scrutiny over the effects of rolling in rates. After relegating this argument to a single footnote in its briefs, Natural referred to it repeatedly at argument. Natural's tactic smacks of sandbagging, and we need "not resolve issues raised so fecklessly." Koger v. Reno, 98 F.3d 631, 634 (D.C.Cir.1996); cf. DiCola v. FDA, 77 F.3d 504, 506 n. * (D.C.Cir.1996) ("As the parties have argued the issue in the margins, so too do we dispose of it.")
 
 
 [3]
 In its reply brief, Natural appears to contest the sufficiency of the factual bases for FERC's findings regarding integration and the existence of system-wide benefits. Natural claims that those findings have been in dispute throughout this proceeding. In support of its argument, Natural refers us to the administrative record. We have consistently held that "[c]onsidering an argument advanced for the first time in a reply brief ... is not only unfair to an appellee but also entails the risk of an improvident or ill-advised opinion on the legal issues tendered." McBride v. Merrell Dow & Pharmaceuticals, Inc., 800 F.2d 1208, 1211 (D.C.Cir.1986) (citations omitted). A party does not preserve factual issues on appeal by raising them in the administrative proceeding and then referring to them without elaboration in a reply brief. Not only does the opposing party lose its opportunity to contest the merits of the factual challenge, but the court does not get the benefit of the adversarial process. Natural has forfeited any factual objections to FERC's orders
 
 
 [4]
 Although Northern States Power claims that the $0.015 per Mcf difference is de minimis, we need not decide whether that 6 percent difference in the price per Mcf is significant